IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ANGELA M. JONES,<br>　　Plaintiff, | § | |
| | § | |
| | § | |
| | § | Civil Action No. 3:19-CV-0880-BH |
| | § | |
| ANDREW SAUL, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| 　　Defendant. | § | Referred to U.S. Magistrate Judge[1] |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Angela M. Jones (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying her claims for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. (*See* docs. 1, 17.) Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

## I.  BACKGROUND

On March 29, 2016, Plaintiff filed her applications for DIB and SSI, alleging disability beginning on January 1, 2015. (doc. 12-1 at 235.)[3] Her claim was denied initially on June 29, 2016 (*Id.* at 144), and upon reconsideration on September 29, 2016 (*id.* at 153). On October 31, 2016, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 157.) She appeared and testified at a hearing on September 25, 2017. (*Id.* at 52.) On April 5, 2018, the ALJ issued a

---

[1]By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2]At the time this appeal was filed, Nancy A. Berryhill was the Acting Commissioner of the Social Security Administration, but Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019, so he is automatically substituted as a party under Fed. R. Civ. P. 25(d).

[3]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

decision finding her not disabled.  (*Id.* at 34.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on May 10, 2018, and included new evidence. (*Id.* at 22-30, 216.)  The Appeals Council determined that the new evidence did not provide a basis for changing the decision and denied her request for review on January 11, 2019, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 10-13.)  She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

## A.    **Age, Education, and Work Experience**

Plaintiff was born on June 18, 1975, and was 42 years old at the time of the hearing. (doc. 12-1 at 58, 217.)  She had completed two years of college and could communicate in English.  (*Id.* at 60.)  She had past relevant work as a rural mail carrier, a lead title typist, a receptionist, and a mortgage loan processor. (*Id.* at 77-78.)

## B.    **Medical, Psychological, and Psychiatric Evidence**

In October 2012, Plaintiff presented to a physician assistant (PA) at the Veterans Affairs Medical Center (VAMC) for examination of her lumbar back in connection with her Veterans Affairs (VA) disability claim.  (doc. 12-1 at 786-98.) She reported first experiencing low back pain in 1996, and it was exacerbated by a motor vehicle accident in 2008, and a work injury in 2010.  (*Id.* at 787.)  She attempted chiropractic treatment but discontinued it due to increased pain. (*Id.*)  She was experiencing three to four pain flare-ups per week, which she rated between six and eight out of ten. (*Id.* at 787.)  She was able to work, but needed frequent breaks and was limited to standing for 10 to 15 minutes. (*Id.*) Her X-rays and an examination for spinal abnormalities were negative, but her MRIs showed annular tears and small disc protrusions. (*Id.* at 797-98.)  She was diagnosed with mechanical low back pain. (*Id.*)

2

On January 6, 2015, Plaintiff underwent bilateral breast reduction surgery because of back and neck pain caused by breast hypermastia. (*Id.* at 642.)  On January 27, 2015, she presented to the VAMC for a post-surgery appointment. (*Id.* at 606-12.)  She reported constant aching and stabbing pain in her lower back with occasional burning pain in her legs, and it exacerbated with bending and lifting movements. (*Id.* at 612.)  She had received three epidural steroid injections (ESI) without benefit. (*Id.*)

On February 25, 2015, Plaintiff presented to the VAMC for a bilateral L3-S1 medical branch block. (*Id.* 1092-94.)  The treating physician noted chronic low back pain in the lumbosacral area that was failing medical therapy.  (*Id.* at 1092.)

On March 4, 2015, Plaintiff returned to the VAMC and was fitted for a lumbar spine brace. (*Id.* at 945.) A TENS unit was used on the lumbar region for pain relief (*Id.*)  She received another medical branch block on March 9, 2015, and a caudal ESI on March 30, and she reported good pain relief after both procedures. (*Id.* at 557, 581-82.)  She was diagnosed with low back pain and lumbosacral radiculitis/radiculopathy. (*Id.*)

On March 20, 2015, a lumbar MRI confirmed degenerative disc changes, most pronounced at L4-L5. (*Id.* at 1183.) It also showed generally diminished volume of the spinal canal throughout, primarily on the basis of congenitally short pedicles, and secondarily to acquired degenerative changes. (*Id.* at 1184.)

On June 29, 2015, Plaintiff presented to the VAMC for a psychiatry evaluation.  (*Id.* at 552-53.)  She was not working because of her back pain, and reported that things at home were "kinda tight," and that she was "feeling the effect of [not taking] medication for several months."  (*Id.* at 552.)  She also reported symptoms of insomnia and crying, but remained hopeful.  (*Id.*)  She was

diagnosed with depression and anxiety and was prescribed antidepressants, Mirtazapine and Venlafaxine. (*Id.* at 552-53.)

On August 27, 2015, Plaintiff presented for a physical performance examination (PPE) for her Workers Compensation claim. (*Id.* at 360-66.)  She had injured her low back while working as a mail carrier. (*Id.* at 360.)  She reported constant burning pain with tingling and burning sensation to the bilateral lower extremities, and rated her pain level between five and nine out of ten. (*Id.*)  Grip testing indicated a 28 percent right-side deficit at position two when compared with the opposite hand. (*Id.* at 361.) She showed restricted range of motion in the lumbar spine and significant signs of decreased functional ability due to injuries to the lumbar region. (*Id.* at 366.)  The examining physical therapist opined that she was functioning at the sedentary-light level, and that she should be referred for pain management. (*Id.*)

On August 28, 2015, Plaintiff returned to the VAMC complaining of chronic low back pain and burning and tingling sensation in the legs. (*Id.* at 544.)  She reported morning stiffness, pain and burning sensation down the hips to the legs and calves, and cramping in the feet when walking.  (*Id.*)  She tolerated her current medications and was able to do some of her desired physical activities with occasional soreness. (*Id.* at 545.)  She reported obstructive sleep apnea and having difficulty sleeping because of pain, depression, and anxiety.  (*Id.* at 546.) She denied any arm or leg weakness and foot drop or dragging, but had limited motion of the wrist, and her facet loading test was positive. (*Id.* at 545-46.)  She was assessed with chronic low back pain, bilateral lumbar radiculopathy, disc bulge/protrusions at L3-5, and facet hypertrophy, and was prescribed nerve pain medicine Gabapentin, muscle relaxant Methocarbamol, and narcotic Tramadol. (*Id.* at 547.)

On September 15, 2015, Plaintiff presented for physical therapy. (*Id.* at 340.) She reported

not working because of lumbar pain, and rated her pain between four and ten out of ten, but she was motivated to return to work. (*Id.*)  She was able to drive, go shopping, and pay bills, but needed assistance with laundry. (*Id.*)

On October 13, 2015, Plaintiff presented to the VAMC for a medication management visit for depression and anxiety. (*Id.* at 524.) She reported that her mood was down, her energy was bad, and Mirtazapine was not helping enough for sleep.  (*Id.*)  She had difficulties coping with the recent loss of her mother and had panic attacks. (*Id.*)  She was prescribed Hydroxyzine for insomnia, Venlafaxine was increased, and Mirtazapine was discontinued. (*Id.* at 525.)

On November 16, 2015, Jose Fuentes, M.D., filled out a Physician's Statement form for Plaintiff's claim to the Welfare Division of Dallas County. (*Id.* at 1123.)  He reported her diagnoses as lumbar sprain/strain and lumbar radiculitis, noting that she would be disabled from January 1, 2015 to April 1, 2016. (*Id.*)  She was unable to perform a "heavy work requirement" because of her restricted abilities in standing, walking, lifting, stooping, crouching, climbing, pushing, and pulling. (*Id.*)  He also opined that she was functioning at a medium physical demand level (PDL), but her condition was not severe enough to preclude her from light duty or sedentary work. (*Id.*)

On November 20, 2015, Plaintiff presented for a second PPE. (*Id.* at 379-85.)  Grip testing indicated a six percent right-side deficit at position two when compared with the opposite hand. (*Id.* at 380.)  The examining physical therapist noted that she continued to show significant signs of decreased functional ability of the lumbar spine, and that she was functioning at a light-medium PDL. (*Id.* at 385.)

On January 12, 2016, Plaintiff presented to the VAMC for major depression. (*Id.* at 512-13.) She reported feeling anxious and "horrible," crying, experiencing an increased heart rate, and not

sleeping. (*Id.*)  She was instructed to taper off Venlafaxine, start Duloxetine, and discontinue Hydroxyzine. (*Id.* at 513.)

On February 18, 2016, Plaintiff returned to the VAMC for a physical medicine follow-up. (*Id.* at 502.)  She reported "doing about the same" and that her last ESI provided no lasting pain relief. (*Id.*) She had burning sensation to both hips and her pain level ranged between three and nine out of ten most days. (*Id.*)  She had tried chiropractic care, aqua therapy, and injections with minimal relief. (*Id.*)  On examination, she had a positive facet loading test and her lumbar range of motion was impaired. (*Id.* 505).

On March 24, 2016, Plaintiff underwent a third PPE. (*Id.* at 398-404.)  Grip testing indicated a 26 percent right-sided deficit, and her lumbar range of motion was restricted in all cardinal planes of motion.  (*Id.* at 399, 403.) Her current functional demand level was at sedentary. (*Id.* at 404).

On March 29, 2016, Plaintiff returned to the VAMC complaining of bilateral hand numbness, pain, and weakness, which was worse on the left. (*Id.* at 488.)  Her pain was constant, stabbing, and radiated into the entire hand, and her wrist braces no longer alleviated symptoms. (*Id.*) An EMG/nerve study revealed mild to moderate demyelinating median mononeuropathy of both wrists. (*Id.* at 490.)  She received an order for new bilateral wrists splints, and she was administered a steroid injection for carpal tunnel in her left wrist on April 22, 2016. (*Id.* at 491, 819-20.)

On April 19, 2016, Plaintiff presented to the VAMC with her 13-year old daughter, complaining of depression.  (*Id.* at 479-82.)  She reported mood swings and no significant improvement with her current medication. (*Id.* at 479.)  Her daughter reported irritability and tearfulness swings. (*Id.* at 479-80.)  Her prescription for Duloxetine was increased, and the one for Trazodone was adjusted. (*Id.* at 482.)

On April 22, 2016, Plaintiff presented to the VAMC for wrist pain. (*Id.* at 819-22.) She reported that a left steroid carpal tunnel injection in 2010 had made her symptoms worse. (*Id.* at 821.) A limited ultrasound of her left wrist revealed median nerve diameter enlargement consistent with carpal tunnel syndrome. (*Id.* at 822.) She was administered a steroid injection for carpal tunnel in her left wrist. (*Id.* at 819-20.)

On April 25, 2016, Plaintiff presented for a fourth PPE. (*Id.* at 421-28.) Grip testing indicated a 22 percent left-side deficit at position one when compared with the opposite hand, and a sustained grip test showed no deficit in the ability to maintain contraction. (*Id.* at 422-23.) She demonstrated moderate signs of decreased functional ability from lumbar spine injuries, and continued to show range of motion deficits. (*Id.* at 427.)

On May 12, 2016, Plaintiff presented to Cesar Duclair, M.D., complaining of low back pain. (*Id.* at 1303-04.) She reported increased pain from extensions and when returning to a neutral position from a bent position, and had problems going from sitting to standing due to axial back pain. (*Id.* at 1303.) She denied numbness and tingling in the lower extremities. (*Id.*) She exhibited reduced range of motion to the lumbar spine with straight leg raise (SLR) testing, and facet joints at L4-S1 were moderately to severely tender to palpation. (*Id.*) Dr. Duclair assessed lumbar strain and lumbar radiculitis. (*Id.* at 1304.)

On May 16, 2016, Plaintiff presented to Dr. Fuentes for low back pain treatment. (*Id.* at 1305-06.) She reported sharp low back pain radiating to both legs, greater on the right. (*Id.* at 1305.) She had a waddling gait, L3-S1 facet tenderness with right greater than left, positive right-sided Kemp's test and Patrick FABER's, positive Gaenslen's and thigh-chest thrust tests, and bilateral SI joint tenderness. (*Id.*)

On May 31, 2016, Plaintiff presented to the VAMC with chronic low back pain and leg tingling. (*Id.* at 812.) She reported "doing about the same" and had back stiffness, burning sensation to both hips, and increasing pain levels. (*Id.*)  She could not receive additional steroid injections because her A1c levels were over 8.0.  (*Id.* at 817.)

On June 1, 2016, Plaintiff returned to the VAMC with her daughter for medication adjustment.  (*Id.* at 807-09.)  She reported that her sleep was broken and her depression "stay[ed] at a level 8/10 daily." (*Id.* at 807.) Her daughter reported bouts of crying and snapping at people "for no reason." (*Id.*)  Short term memory loss was observed on examination. (*Id.* at 808.)  Duloxetine was discontinued, and she was started on antidepressant Bupropion. (*Id.* at 809.)

On June 2, 2016, Plaintiff presented to the VAMC for a sleep medicine consultation for sleep apnea. (*Id.* at 798-802.)  She reported an eight to ten year history of snoring, occasional morning headaches, excessive daytime sleepiness, and some sleepiness while driving. (*Id.* at 799.)  She had an Epworth sleepiness score of 14, and was diagnosed with sleep apnea and multifactorial insomnia. (*Id.* at 802).

On June 10, 2016, Plaintiff presented to Dr. Duclair for a right-sided lumbar rhizotomy at L4-S1. (*Id.* at 1321-22).  A radiofrequency probe revealed contraction of the lumbar paraspinal muscles without contraction of the right lower extremity muscles. (*Id.* at 1321.)  She tolerated the procedure well, and there were no complications. (*Id.* at 1322.)

On June 17, 2016, State Agency Medical Consultant (SAMC) Teresa Fox, M.D., completed a physical residual functional capacity (RFC) assessment based on the medical evidence.  (*Id.* at 91-93.)  She opined that Plaintiff had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit for about 6 hours in an 8-hour workday; push and pull

unlimited weight (other than shown for lift and carry) with no restrictions on hand or foot controls; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl, with manipulative limitations of frequent bilateral handling and no visual, communicative, or environmental limitations. (*Id.* at 92-93.) Based on her physical RFC, Plaintiff had the maximum sustained work capability for light work. (*Id.* at 96.) Dr. Fox opined that Plaintiff's alleged symptoms were partially supported by the evidence of record. (*Id.* at 93.)

On June 20, 2016, State Agency Psychological Consultant (SAPC) Richard Campa, Ph.D., completed a Psychiatric Review Technique (PRT) for Plaintiff. (*Id.* at 93-95.) He found that Plaintiff had a history of major depression, and her affective disorders were severe medically determinable impairments. (*Id.* at 89.) Dr. Campa opined that she had sustained concentration and persistence limitations, and was moderately limited in carrying out detailed instructions, maintaining attention and concentration for extended periods, working in coordination with others without distraction, completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at 94.) She had social interaction limitations and was moderately limited in accepting instructions and responding appropriately to criticism from supervisors, and she had adaptation limitations and was moderately limited in responding appropriately to changes in the work setting. (*Id.* at 94-95.) Dr. Campa also completed a mental RFC assessment and found that Plaintiff was maximally able to understand, remember, and carry out detailed but not complex instructions; make basic decisions; attend and concentrate for extended periods; interact with supervisors and co-workers; accept instructions; and respond to changes in a routine work setting.

9

(*Id.* at 95.)  He opined that the alleged severity of her limitations was partially supported by the medical evidence. (*Id.*)

On July 21, 2016, Plaintiff's treating psychiatrist, Osman Ali, M.D., completed a mental RFC. (*Id.* at 1120-22.)  He noted that she had marked limitations in understanding and remembering complex instructions, carrying out complex instructions, and making judgments on complex work-related decisions, as well as moderate limitations in interacting appropriately with supervisors, co-workers, and the public, and responding to changes in a routine work setting. (*Id.* at 1120-21.)  He opined that her mental impairments also affected her sleep, energy, mood, and interest. (*Id.* at 1121.)

On July 7, 2016, Plaintiff returned to Dr. Duclair for a left-sided lumbar rhizotomy at L4-S1. (*Id.* at 1323.)  A radiofrequency probe revealed contraction of the lumbar paraspinal muscles without contraction of the left lower extremity muscles. (*Id.*)  She tolerated the procedure well, and there were no complications. (*Id.*)

On July 15, 2016, Plaintiff presented to Nicole Bartram, NP, with complaints of low back pain. (*Id.* at 1311.)  She reported that her recent rhizotomies only minimally helped relieve pain, and that her low back pain was still constant and throbbing.  (*Id.*)  She continued having difficulties transferring from sitting to standing due to axial back pain. (*Id.*)

On the same day, Plaintiff presented for a fifth PPE. (*Id.* at 1363-68.) Grip testing indicated a fourteen percent right-side deficit at position two when compared with the opposite hand. (*Id.* at 1364.)  The examining physical therapist noted mild signs of decreased functional ability, and that Plaintiff was functioning at a sedentary PDL. (*Id.* at 1368.)

On July 18, 2016, Plaintiff underwent testing for sleep apnea at the VAMC. (*Id.* at 1555-57.)  The sleep study was positive for very mild obstructive sleep apnea, and she was referred for a

Continuous Positive Airway Pressure (CPAP) machine. (*Id.* at 1556.)

On July 20, 2016, Plaintiff presented to the VAMC for a medication adjustment visit. (*Id.* at 1552-55.) Her mood was "basically the same" after her medication was changed from Duloxetine to Bupropion, and she did not want to change her medication. (*Id.* at 1552.) She continued experiencing mood swings and crying spells at times, but was interested in therapy. (*Id.*) On examination, Plaintiff appeared well-groomed, was cooperative, and had euthymic and congruent mood, normal speech rate and tone, a goal-directed and logical thought process, and good insight and intact judgment. (*Id.* at 1553-54.)

On August 11, 2016, Plaintiff presented to Douglas Sammer, M.D., at UT Southwestern Medical Center for Carpal Tunnel Release (CTR) surgery on the left wrist. (*Id.* at 1205.) At a post-surgery visit on August 29, 2016, she complained of no improvement of carpal tunnel symptoms. (*Id.* at 1211.) Dr. Sammer noted that she was more stiff than she should be, but that her pain was overall well-controlled; he referred her to occupational therapy (OT) the same day. (*Id.*) During the OT evaluation, Plaintiff reported significant pain and was fearful of moving her left hand and wrist due to pain. (*Id.* at 1216.) The occupational therapist noted that Plaintiff had severe deficits in the dominant left hand for range of motion, for strength, and for functional use, and that she was currently unable to use her left hand with any daily activities. (*Id.* at 1217.)

On September 12, 2016, Plaintiff returned to Dr. Fuentes for a follow-up visit. (*Id.* at 1313.) She complained of sharp low back pain radiating to both legs with right greater than left, and rated her pain between five and seven out of ten. (*Id.*) Dr. Fuentes noted that she continued to function at a medium PDL with a medium-heavy work requirement, and placed her on off work duty status. (*Id.* at 1313-14.)

On September 14, 2016, Thomas Geary, Ph.D., another SAPC, reviewed the medical evidence and completed a mental RFC that mirrored Dr. Campa's mental RFC. (*Id.* at 119-22.) His assessment of Plaintiff's mental limitations closely resembled Dr. Campa's, except he found that Plaintiff was also moderately limited in accepting instructions and responding appropriately to criticism from supervisors. (*Id.* at 121.) Dr. Geary affirmed Dr. Campa's opinion finding that Plaintiff's alleged limitations were not fully supported by the medical evidence. (*Id.* at 122.)

On September 15, 2016, SAMC Scott Spoor, M.D., completed a physical RFC that mirrored Dr. Fox's physical RFC. (*Id.* at 118-20.) He also affirmed Dr. Fox's opinion finding that Plaintiff's alleged limitations were partially supported by the medical evidence and other evidence in the file. (*Id.* at 115.)

On September 23, 2016, Plaintiff returned to the VAMC with chronic low back pain and intermittent leg tingling. (*Id.* at 1537-41.) She reported morning stiffness, burning sensation to both hips, and cramps in feet when walking, and recent carpal tunnel surgery. (*Id.* at 1537.) She also reported that she was able to do some of her desired physical activities, despite ensuing soreness, and that she continued working as a letter carrier/mail sorter at the post office. (*Id.* at 1537, 1539.) Examination showed full strength throughout upper and lower extremities, normal gait, and negative bilateral seated SLRs, but positive bilateral facet load testing and impaired lumbar range of motion. (*Id.* at 1540.) There were no changes in her medications, but steroid injections were deferred because her A1c levels remained over 8.0. (*Id.* at 1541.)

On October 10, 2016, Plaintiff returned to Dr. Sammer for a CTR surgery follow-up. (*Id.* at 1234.) He noted that motion of the left wrist was "markedly better," and that she was no longer experiencing numbness or tingling in the left hand. (*Id.*) On examination, Plaintiff's left wrist

showed "excellent motion," Thenar function was intact, and she had normal sensibility in the fingertips and no loss of sensibility in the palm. (*Id.*) She also had marked hypersensitivity over her scar that was tender to palpation. (*Id.*) Dr. Sammer opined that Plaintiff was doing well in terms of symptom resolution and recovery of motion, and referred her to OT for pain management and desensitization. (*Id.*)

On the same day, Plaintiff presented for a sixth PPE. (*Id.* at 1379-84.) Grip testing indicated a 42 percent left-side deficit at position one when compared with the opposite hand, and a sustained grip test for contraction ability indicated a 56 percent left-side deficit. (*Id.* at 1381.) She continued to show mild signs of decreased functional ability of the lumbar spine, and remained at a sedentary PDL. (*Id.* at 1384.)

Plaintiff attended group therapy sessions at the VAMC on October 20, and October 27, 2016. (*Id.* at 1521-22, 1527.) She was alert and engaged, had good eye contact, responded to feedback from the group, and verbalized appreciation for the group. (*Id.*)

On November 14, 2016, Plaintiff presented to the VAMC for a mental health progress evaluation. (*Id.* at 1515-18.) She reported that she continued to feel irritable, and it was getting worse, and that she was depressed, cried a lot, and was easily anxious. (*Id.* at 1515.) She also had poor attention span, anhedonia, low energy, and low motivation. (*Id.*) She was assessed with major depression and a history of not responding to multiple treatments. (*Id.* at 1518.) Bupropion was increased, and Duloxetine was added with gradual reduction of Trazodone. (*Id.*)

Plaintiff returned to Dr. Fuentes for office visits on November 14 and December 19, 2016. (*Id.* at 1315-18.) At both appointments, she had sharp low back pain radiating to both legs, more on the right, and she rated her pain between five and seven out of ten. (*Id.*) Dr. Fuentes opined that she

was functioning at a medium PDL and continued to place her on off work duty status. (*Id.*)

Dr. Fuentes also completed a form medical source statement dated November 28, 2016, for Plaintiff's Social Security disability application. (*Id.* at 1119-24.) He opined that she could occasionally lift and carry up to 20 pounds; sit five hours, stand two hours, and walk one hour in an eight-hour workday; occasionally balance and stoop, but never kneel, crouch, or crawl; never climb stairs, ramps, ladders, or scaffolds; use both hands to frequently reach and handle and to continuously finger and feel, but never push or pull; and occasionally operate foot controls with both feet; she could not walk a block at a reasonable pace on rough or uneven surfaces. (*Id.*) Dr. Fuentes also opined that these limitations would last for at least twelve consecutive months. (*Id.* at 1129.)

On November 28, 2016, Plaintiff presented to Patrick Donovan, M.D., for medical evaluation. (*Id.* at 1130-31.) He noted that she had a six-year history of ongoing lower lumbosacral back pain with painful radiating paresthesias into the bilateral lower feet and ankles. (*Id.* at 1131.) On examination, the lumbar spine showed numerous localized trigger points and tender spots to light palpation with 2+ positive jump sign. (*Id.* at 1130.) There were no signs of any significant active muscle spasm, but SLR and sciatic tension testing were both positive bilaterally. (*Id.*) Electromyogram test results showed positive electrodiagnostic evidence of bilateral L5 lumbosacral radiculopathy that was both acute and chronic in nature. (*Id.* at 1131.)

On December 21, 2016, Plaintiff presented to John Sazy, M.D. (*Id.* at 1174-76.) She reported not working, and that her injections and rhizotomies did not help alleviate her pain or lumbar symptoms. (*Id.* at 1175.) On examination, she showed positive spasm and lumbar facet pain and SLR, Milgram's test, and Kemp's test were positive. (*Id.* at 1176.) Dr. Sazy assessed disc disruption lumbar spine at L3-4, L4-5, L5-S1 and aggravation of congenital stenosis with lumbar

14

radiculopathy, and EMG testing revealed bilateral L5 radiculopathy. (*Id.* at 1176.)

On January 5, 2017, Plaintiff presented to the Spine Institute of Texas for a new patient consultation. (*Id.* at 1136.)  A lumbar MRI scan showed some degenerative change at L4-5 and L5-S1 with some foraminal narrowing, but no worrisome central stenosis. (*Id.*)  A January 6, 2017 lumbar spine X-ray showed mild disc disease at L5-S1. (*Id.* at 1185.)

On February 14, 2017, Plaintiff spoke with a VAMC staff physician on the phone after missing her mental health appointment. (*Id.* at 1497.) She was sleeping approximately 5 to 6 hours a night, and her medication was managing her depression but not her irritability. (*Id.*) She reported doing okay and was still happy with her current medication regime. (*Id.*)  The staff physician noted that Plaintiff sounded fine on the phone with no thought process disorder or suicidal ideation. (*Id.*)

On February 20, 2017, Plaintiff returned to Dr. Fuentes for a follow-up visit. (*Id.* at 1319-20.) On examination, SLR produced moderate axial low back pain at approximately 75 degrees, and her facet joints at L4-S1 was moderately to severely tender to palpation. (*Id.* at 1320.).  Dr. Fuentes continued to place her on off work duty status. (*Id.*)

Plaintiff had follow-up appointments with Dr. Sazy on February 16, March 27, and May 4, 2017. (*Id.* at 1142-44, 1147-49, 1151-53.) Examination at each appointment revealed positive SLR, Milgram's test, and Kemp's test. (*Id.*)

On May 5, 2017, a right shoulder MRI revealed a moderate grade intrasubstance partial tear involving the anterior supraspinatus tendon, mild osteoarthritis of AC joint, and moderate osteoarthritis of glenohumeral joint. (*Id.* at 1155-56.)

On October 6, 2017, Plaintiff returned to Dr. Sazy for a lumbar fusion at L5-S1. (*Id.* at 1570.) Dr. Sazy noted that the right L5-S1 facet complex was "totally gone" and that she had a right

conjoined L5-S1 nerve root. (*Id.* at 1577.) He also found a rudiment of the right S1 pedicle and placed a right S1 pedicle screw. (*Id.*) Plaintiff was prescribed home health, physical therapy, and a walker. (*Id.* at 1578.)

## C.   Hearing

On September 25, 2017, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 52-85.) Plaintiff was represented by an attorney. (*Id.* at 54.)

### 1.   Plaintiff's Testimony

Plaintiff testified that she was not working and had two children under the age of eighteen. (*Id.* at 59.) She drove herself to the hearing and would drive each day to drop off and pick up her children from school. (*Id.* at 60.) She attended college for two years and had an associate's degree in General Studies. (*Id.*) She previously worked as a receptionist at a mortgage company, where she answered the phone and prepared and researched mortgage files for closing. (*Id.* at 60-61.) She was promoted to title typing lead, where she typed information into the system for the title companies and marked codes throughout the closing process. (*Id.* at 61.) Plaintiff's next and final job was working full-time as a mail carrier at the post office. (*Id.* at 62-63.) She injured her lower back in September 2010 and continued to work, but ultimately left the post office job in January 2015 because her position did not provide limited or light duty work. (*Id.* at 63.)

Plaintiff was scheduled for back surgery on October 6, 2017, to have four screws inserted in the lumbar spine and repair nerve damage. (*Id.* at 64.) On the day of the hearing, she took medication for her blood pressure, depression, anxiety, and pain, and her medications caused drowsiness. (*Id.*) Plaintiff's back pain at the time she stopped working at the post office had increased from when she injured her back in 2010 because the procedures she had received made

her symptoms worse. (*Id.* at 65.)  When she was a typist, she typed sixty words per minute and would sit between 8 to 12 hours per shift.  (*Id.*)  She would not be able to perform that job because her carpal tunnel issues had increased and she would be unable to maintain the required typing pace. (*Id.* at 65-66.)  She was left-handed, but surgery on her left hand did some damage, and she could not use her left hand to hold, grip, or carry like before. (*Id.* at 65.)  She could not sit six hours out of an eight hour day because of her pain, and would need to take constant breaks and stand to try to alleviate pain. (*Id.* at 66.)

Since January 2015, Plaintiff had several injections and a rhizotomy on both sides of her back, and she tried physical therapy for her back for three to four months, but got no relief from her pain.  (*Id.* at 67-68.)  After left hand surgery, she could not use her left hand to grip and hold things, and she was unable to comb her children's hair or cut food and cook.  (*Id.*)  She could not use her right hand because it was deformed.  (*Id.* at 68.)  She depended on her children to do household chores because of pain and problems with her back and hands.  (*Id.* at 69.)  Her back pain would start in her middle back and radiated down to her hips and legs, and the pain affected her ability to walk and bend. (*Id.* at 70.)  If sitting for an hour, she would need at least three breaks lasting 5 to 10 minutes in duration. (*Id.*)  She could only walk a slow pace for half a block, and would have to take pain pills and lay down after walking.  (*Id.* at 71.)  She rated her average pain level on a regular day at a five, and each week she experienced four days of level ten pain.  (*Id.* at 72.)  The pain affected her mood and caused her to cry and fuss, or to get angry and argumentative. (*Id.*)  She could not read more than a chapter at a time because she was struggled to stay focused due to her pain and depression. (*Id.*)  She struggled with insomnia and could get up to five hours of sleep on a good night. (*Id.* at 73.)  When she left her job as a postal carrier, she had trouble keeping up with the

required pace. (*Id.* at 74.)

### 2.    VE's Testimony

The VE testified that Plaintiff had previous work experience as a rural mail carrier, which was medium work with a Specific Vocational Preparation (SVP) of 2; as a lead title typist, which was sedentary work with a SVP of 3; as a receptionist, which was sedentary work with a SVP of 4; and as a mortgage loan processor, which was sedentary work with a SVP of 5. (*Id.* at 77-78.)  A hypothetical person with the same age, education, and work experience history as Plaintiff would not be able to sustain her prior work with the following limitations: lift and/or carry no more than 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit for six hours in an eight hour workday with normal breaks; operate foot controls occasionally; climb ramps and stairs occasionally, but never climb ladders, ropes, or scaffolds; balance, stoop, kneel, crouch, and crawl occasionally; engage in frequent handling and fingering; avoid exposure to extremes of heat and to hazards of unprotected heights and unguarded, moving machinery; and perform detailed, but not complex tasks in an environment involving few, if any, workplace changes, with no more than occasional contact with coworkers, supervisors, and the public. (*Id.* at 78-79.) There was other available work that the hypothetical person could perform, including ticket printer and tagger (light and SVP-2) with 22,000 jobs nationally; mail clerk (light and unskilled work) with 18,000 jobs nationally; and garment bagger (light and SVP-1) with 17,000 jobs nationally. (*Id.* at 122-24, 126-27.)  If the hypothetical person was limited to sedentary work, she could perform SVP-2 level work, including that of a document preparer (32,000 jobs nationally), an addresser (21,000 jobs nationally), and a nut sorter (14,000 jobs nationally). (*Id.* at 76-77.)  If the hypothetical person was additionally limited to occasional handling and fingering, she could only perform work as a

surveillance system monitor with 5,500 jobs nationally. (*Id.* at 81-82.)  There was no available work

if the hypothetical person also required unscheduled work breaks during the day such that she would

be off-task more than 15 percent of the workday or workweek, or if she would only be able to work

four to six hours maximum in a workday. (*Id.* at 83-84.)  His testimony was consistent with the

Dictionary of Occupational Titles (DOT) and the Occupational Outlook Handbook.  (*Id.* at 84.)

### D.    <u>ALJ's Findings</u>

The ALJ issued a decision denying benefits on April 5, 2018. (*Id.* at 34.)  At step one, she

found that Plaintiff had met the insured status requirements through March 31, 2020, and had not

engaged in substantial gainful activity since the alleged onset date of January 1, 2015.  (*Id.* at 36.)

At step two, the ALJ found that she had the following severe impairments: degenerative joint disease

of the right shoulder with a partial rotator cuff tear, degenerative disc disease of the lumbar spine

status post lumbar fusion at L5-S1, obesity, obstructive sleep apnea, carpal tunnel syndrome, major

depressive disorder, and anxiety disorder. (*Id.* at 36-37.)  Despite those impairments, at step three,

the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically

equaled the severity of one of the listed impairments in the social security regulations. (*Id.* at 37.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work, except she

could lift and/or carry no more than 20 pounds occasionally and 10 pounds frequently; stand and/or

walk and sit for six hours in an eight-hour workday with normal breaks; occasionally operate foot

controls; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds;

occasionally balance, stoop, kneel, crouch, and crawl; and frequently handle and finger, and she

must avoid exposure to extreme heat and to hazards such as unprotected heights and unguarded

moving machinery; be limited mentally to performing detailed but not complex tasks in an

19

environment that involves few, if any, workplace changes; and be limited to occasional interaction with supervisors, co-workers, and the public. (*Id.* at 39.)  At step four, the ALJ determined that Plaintiff was unable to perform her past work.  (*Id.* at 43.)  At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that she was not disabled whether or not she had transferable job skills, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform.  (*Id.* at 44.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from January 1, 2015, through the date of the decision. (*Id.* at 45.)

**E.**    **New Evidence Submitted to the Appeals Council**

Plaintiff timely appealed the ALJ's decision to the Appeals Council and submitted new evidence consisting of an MRI report of her lumbar spine dated May 2, 2018, as well as the medical opinion of Dr. Sazy, dated May 15, 2018. (doc. 12-1 at 22-30.)  The MRI revealed some clumping of right-sided nerve roots and thickening of the dura on the right at L5-S1, evidencing some arachnoiditis; a pseudarthrosis on the right with a prominent right transverse process contacting the right side sacrum; a 3 mm protrusion with annular fissure L4-5 with facet disease; mild neural foraminal narrowing; and some disruption of portions of the gluteal musculature. (*Id.* at 29-30.) Based on the MRI report, Dr. Sazy opined that the right L5-sacral pseudarthrosis and L4-5 adjacent disc and joint disease with annular tear were new pain generators, and that Plaintiff might need a L4-5 right metroplasty of the dura and nerve roots and a right sacral screw to address and stabilize the pseudarthrosis. (*Id.* at 28.)  He prescribed Hydrocodone and Gabapentin, and noted that therapy had not been approved. (*Id.*)

The Appeals Council denied the request for review on January 11, 2019, and determined that the new evidence did not relate to the period at issue, and therefore did not provide a basis for changing the ALJ's decision. (*Id.* at 10-11.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Id.*  The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See Id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant

22

satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.  ISSUES FOR REVIEW

Plaintiff presents three issues for review:

1.      Whether the ALJ's RFC is [s]upported by [s]ubstantial [e]vidence[.]

2.      Whether the ALJ [e]rred in [e]valuating the [o]pinion [e]vidence[.]

3.      Whether the [s]ubjective [s]ymptom analysis is [f]lawed.

(doc. 17 at 2.)

### A.      <u>Medical Opinion Evidence</u>

Plaintiff argues that the ALJ did not properly consider and weigh the medical opinion evidence in the record. (doc. 17 at 14-20.)

#### *1.      Treating Physician Rule*

Plaintiff contends that the ALJ's analysis of her treating physician's opinions were flawed. (doc. 17 at 15-18.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a

treating source. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." See *id.* §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455-56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of

the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.*
at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical
evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than
another," or when the ALJ has weighed "the treating physician's opinion on disability against the
medical opinion of other physicians who have treated or examined the claimant and have specific
medical bases for a contrary opinion." *Id.* at 458.

Here, Dr. Fuentes completed a Physician's Statement for a Dallas County financial assistance
application in November 2015. (*Id.* at 1123.) He opined that she had been disabled due to her
lumbar back, and that her disability would last from January 1, 2015 to April 1, 2016. (*Id.*) He
determined that she was functioning at a medium PDL, and that her condition was not severe enough
to preclude her from light duty or sedentary work. (*Id.*) Dr. Fuentes also completed a "check-the-
box" medical source statement for Plaintiff in November 2016. (*Id.* at 1119-24.) He opined that
could she could occasionally lift and carry up to 20 pounds; sit five hours, stand two hours, and walk
one hour in an eight-hour workday; occasionally balance and stoop, but never kneel, crouch, or
crawl; never climb stairs, ramps, ladders, or scaffolds; use both hands to frequently reach and
handle, to continuously finger and feel, but never push or pull; and occasionally operate foot
controls with both feet. (*Id.* at 1124-27.) He determined that these limitations would last for at least
twelve consecutive months. (*Id.* at 1129.)

The ALJ considered Dr. Fuentes's opinions and determined that they were entitled to only
"some weight." (*Id.* at 43.) She noted that the exertional range issued by Dr. Fuentes was similar
to the range provided by the SAMCs, but his statement that Plaintiff was unable to work was "not
entitled to weight as medical opinion, because it speaks to an issue of disability, which is reserved

to [the Commissioner]." (*Id.*)  Dr. Fuentes also acknowledged that this was a temporary restriction, and "not indicative of the claimant's functioning as a whole." (*Id.*)  The ALJ also noted that the physical limitations assessed by Dr. Fuentes were supported by the clinical findings discussed in the SAMCs' opinions and, to an extent, by Plaintiff's reported daily activities, but the opinion that she could not perform "most postural maneuvers [was] not supported by the mild clinical findings and physical examinations that did not suggest this degree of limitation." (*Id.*)

Although the ALJ did not make a specific finding as to each of the factors in 20 C.F.R. §§ 404.1527(c)(1) and 416.927, she specifically stated that she considered the opinion evidence as required by 20 C.F.R. §§ 404.1527 and 416.927. (See *Id.* at 39.)  Her decision reflects consideration of the factors: she found that Dr. Fuentes was Plaintiff's treating physician, that the restrictions identified in his November 2016 opinion were temporary and based on Plaintiff's functioning at that time, and that the mild clinical findings and physical examinations did not support the severe limitations regarding postural maneuvers in his November 2017 opinion. (*See id.* at 43.) The regulations require only that the Commissioner "apply the factors and articulate good cause for the weight assigned to the treating source opinion." *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Brewer v. Colvin*, No. 3:11-CV-3188-N, 2013 WL 1949842, at *6 (N.D. Tex. Apr. 9, 2013), *adopted by* 2013 WL 1949858 (N.D. Tex. May 13, 2013); *Johnson v. Astrue*, No. 3:08-CV-1488-BD, 2010 WL 26469, at *4 (N.D. Tex. Jan. 4, 2010). "The ALJ need not recite each factor as a litany in every case." *Brewer*, 2013 WL 1949842, at *6 (citing *Johnson*, 2010 WL 26469, at *4).

Moreover, Dr. Fuentes's medical source statement was only a "brief and conclusory" check-box questionnaire. (*See* docs. 12-1 at 1124-29.)  The Fifth Circuit has recognized that opinions of treating physicians are not entitled to considerable weight when they are brief and

26

conclusory and lack explanatory notes or supporting objective tests and examinations. *See Heck v. Colvin*, 674 F. App'x 411, 415 (5th Cir. 2017); *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011). The ALJ could therefore also discount Dr. Fuentes's opinions in the medical source statement for lacking "any substantive explanation." *See Foster*, 410 F. App'x at 833 (agreeing with the magistrate judge's conclusion that the ALJ did not err in assigning only little weight to a brief and conclusory questionnaire).

To the extent Plaintiff argues that the ALJ erred in failing to give proper weight to Dr. Fuentes's November 2016 statement that she was disabled and unable to work due to her lumbar back, the ALJ properly discounted this statement as a non-medical opinion. (*See* doc. 12-1 at 43.) Sections 404.1527(c) and 416.927(c) do not apply to opinions that a claimant cannot work or is disabled. *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (per curiam). A treating physician's opinions regarding a plaintiff's disability are not medical opinions and are not entitled to any special significance because the issue of disability is a legal conclusion reserved to the Commissioner. 20 C.F.R. § 416.927(d); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003). Because physicians generally define "disability" in a manner distinct from the Social Security Act, an ALJ can properly reject any conclusion of disability as determinative on the ultimate issue. *See Tamez v. Sullivan*, 888 F.2d 334, 336, n.1 (5th Cir. 1989) (doctor's note that claimant was "disabled" did not mean that the claimant was disabled for purposes of the Social Security Act).

The ALJ's reasons for assigning only some weight to Dr. Fuentes's opinions and for disregarding his statements that Plaintiff was disabled, combined with her review and analysis of the objective record, satisfy her duty under the regulations and constitute "good cause" for affording only some weight to them. *See Brewer*, 2013 WL 1949842, at *6 (finding the ALJ's explanation as

to why he did not give controlling weight to a treating physician's opinion constituted "good cause" even though he did not make a specific finding as to each of the factors set forth in 20 C.F.R. § 1527(c)(2)); *Johnson*, 2010 WL 26469, at *4 (same); *Hawkins v. Astrue*, No. 3:09-CV-2094-BD, 2011 WL 1107205, at *6 (N.D. Tex. March 25, 2011) (same); *Gomez v. Barnhart*, No. SA-03-CA-1285-XR, 2004 WL 2512801, at *2 (W.D. Tex. Nov. 5, 2004) (finding the ALJ complies with regulations if the resulting decision reflects that consideration was given to medical consultant's opinion). Remand is therefore not required on this issue.

### 2.    *SAMC Opinions*

Plaintiff next contends that the ALJ's analysis of the SAMC opinions was also flawed because her implicit rejection of their opinions was unsupported by any evidence of record. (doc. 17 at 18-19.)

State agency medical consultants, or SAMCs, are considered experts in Social Security disability determination, and their opinions may be entitled to great weight if they are supported by the evidence. *Hardin v. Astrue*, No. 3:10-CV-1343-B, 2011 WL 1630902, at *7 (N.D. Tex. Mar. 31, 2011), *adopted by* 2011 WL 1633132 (N.D. Tex. Apr. 29, 2011). Although the ALJ is solely responsible for assessing the claimant's RFC, she must consider any opinion by an SAMC in making this assessment. *See* Social Security Ruling (SSR) 96-6p, 1996 WL 374180, at *4 (S.S.A. July 2, 1996). "RFC assessments by [SAMCs] ... are to be considered and addressed in the [ALJ's] decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s)" and "are to be evaluated considering all of the factors ... for considering opinion evidence" outlined in 20 C.F.R. § 416.927(c). *Id.* The ALJ is not required to expressly discuss each finding by an SAMC or discuss each factor listed in 20 C.F.R. § 416.927(c), however,

because such a detailed analysis applies only to the ALJ's rejection of a treating source's uncontradicted opinion. *See Newton*, 209 F.3d at 456-58. The ALJ also "must explain the weight given to these opinions in [her] decision[ ]." SSR 96-6p, 1996 WL 374180, at *4. Moreover, where substantial evidence supports the ALJ's decision, the failure to consider every single opinion or statement of a SAMC may constitute harmless error. *See Alejandro v. Banhart*, 291 F. Supp.2d 497, 516-17 (S.D. Tex. 2003) (the ALJ's failure to consider or document a state agency consultant's opinion is reversible error only if substantial evidence does not support the ALJ's decision).

Here, the ALJ considered and assigned "some weight" to the SAMCs' opinions that Plaintiff was capable of light exertional work. (doc. 12-1 at 42.) She noted that they were supported by the clinical findings, "particularly a sleep study showing mild obstructive sleep apnea, an x-ray of the lumbar spine showing mild degenerative joint disease, an[ ] MRI of the shoulder showing only a partial tear, and an EMG nerve conduction study showing only mild abnormalities," but she found that the evidence, particularly Plaintiff's impending back surgery and paresthesias, reasonably supported "slightly greater limitations." (*Id.*)

Plaintiff argues that when the ALJ considered the opinion evidence of the SAMCs and found that greater limitations were warranted, she had "independently review[ed] evidence of EMGs, MRIs and sleep studies and render[ed] an RFC opinion without medical support" because the SAMCs lacked this evidence, and she "never explain[ed] how she arrived at those 'greater limitations' based on the evidence." (doc. 17 at 18-19.) Even though the SAMCs were unable to review the entire medical record, including Plaintiff's EMGs, MRIs, sleep studies, and impending back surgery, the ALJ considered the medical evidence of Plaintiff's physical impairments, as well as the findings and medical opinions of Plaintiff's treating physicians. (*See* doc. 12-1 at 40-43.) The

ALJ is "free to reject the opinion of any physician when the evidence support[ed] a contrary conclusion." *Newton*, 209 F.3d at 455. Furthermore, it is entirely within the ALJ's purview to resolve any conflicts in the evidence because such conflicts are for the Commissioner, and not the courts, to resolve. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). Although Plaintiff complains that no explanations were provided for "greater limitations," the ALJ's RFC decision can be supported by substantial evidence even if she did not specifically discuss all the evidence that supported her decision or all the evidence that she rejected. *See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994); *see Hunt v. Astrue*, No. 4:12-CV-244-Y, 2013 WL 2392880, at *7 (N.D. Tex. June 3, 2013) ("The ALJ is not required to discuss every piece of evidence in the record nor must the ALJ follow formalistic rules of articulation."). Because substantial evidence supports the ALJ's adoption of slightly greater limitations than those assessed by the SAMCs, remand is not required.

**B.**    **RFC Assessment**

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence. (doc. 17 at 10-14.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable

medical sources.  20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco*, 27 F.3d at 163-64.  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.*  Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

### 1.    *Mental Impairments*

Plaintiff contends that substantial evidence does not support the mental RFC finding that she could "occasionally interact with supervisors, co-workers or the general public." (doc. 17 at 14.)

Here, the ALJ considered Plaintiff's mental limitations when determining her RFC and found

that she could perform detailed but not complex tasks in an environment that involved few, if any,

workplace changes, and was limited to occasional interaction with supervisors, co-workers, and the

public. (doc. 12-1 at 39.)  The ALJ noted and directly considered the medical records from the

VAMC, the opinions of Dr. Ali and the SAPCs, and Plaintiff's testimony from the administrative

hearing. (*See id.* at 39, 41-42.)

The treatment notes from the VAMC indicated that Plaintiff complained of depression, grief,

low-energy, tearfulness, crying spells, anxiety, and irritability, but she was noted as being well-

groomed, attentive, and alert and oriented, and having linear thought processes, no suicidal ideation,

and adequate insight, judgment, and impulse control. (*Id.* at 41-42.)  The ALJ noted that Plaintiff

did not require frequent adjustment of medication or inpatient care, had no adverse effects of

medication, and was participating in group therapy.  (*Id.*)  Although she had reported in February

2017 that her medication was not helping with irritability, her depression was medically controlled

and she reported doing okay. (*Id.* at 42.)  Additionally, Plaintiff's mental health appointments were

spread out every four months, "suggesting she did not require[] more intensive care."  (*Id.*) The ALJ

determined that "[t]he record [did] not support disabling mental limitations." (*Id.*)

The ALJ reviewed the opinions of the SAPCs regarding Plaintiff's mental limitations. (*Id.*

at 39.)  On both initial review and reconsideration, the SAPCs opined that she had moderate

limitations in interacting with others and in persisting and maintaining concentration and pace. (*Id.*)

The ALJ noted that their opinions were "consistent with the record as a whole," and attributed "some

weight" to these opinions. (*Id.*) She also considered Dr. Ali's opinion that Plaintiff had "marked

limitations" in managing complex instructions and work-related decisions, "mild limitations" in

managing complex tasks, and "moderate limitations" in interacting with others.  (*Id.* at 42.)  She accorded "some weight" to this opinion because it was issued by a treating source and was "reasonably supported by the longitudinal record of conservative treatment for depression and anxiety." (*Id.*) Nevertheless, she found that "more than moderate limitations in functioning [were] not consistent with the record" because the clinical findings did not "entirely correlate to the extreme symptom reporting," as Plaintiff never required inpatient care or an intensive day program. (*Id.*)

Plaintiff disagrees with the statement that she did not require frequent adjustment of medication. (doc. 17 at 13.)  While there were adjustments to her medication for depression and anxiety, Plaintiff also reported being satisfied with her medication and that she had no adverse effects.  (*See* doc. 12-1 at .)  The ALJ also noted that she only had appointments regarding mental health every four months and adjustments to her medication, if any, were made at those appointments. (*Id.* at 42.)  This is consistent with the finding of infrequent medication adjustments.

Plaintiff also contends that the ALJ failed to explain "how the final record that medications only helped with depression and not irritability support that she could even occasionally interact with supervisors, co-workers or the general public." (doc. 17 at 14.)  As noted, Plaintiff reported to the VAMC medical staff that her medication did not help with her irritability, but that she did not want to change her medication regime. (doc. 12-1 at 1497.)  She also appreciated group therapy and responded appropriately to feedback from the group. (*Id.* at 1521-22, 1527.)  Moreover, Dr. Ali and the SAPCs opined that Plaintiff had moderate limitations in interacting with others.  (*Id.* at 94, 121, 1120.)  "A finding that Plaintiff can only have occasional contact with the public is consistent with an individual who has difficulty dealing with other people." *Howard v. Berryhill*, No. 3:16-CV-318-BN, 2017 WL 551666, at *9 (N.D. Tex. Feb. 10, 2017).  Because the mental RFC was

limited to interacting with others, including supervisors, co-workers, and the public, on an occasional basis, it is consistent with Dr. Ali's recommended restrictions, as well as with the opinions of the SAPCs. *See Herring v. Astrue*, 788 F. Supp.2d 513, 523 (N.D. Tex. Apr. 22, 2011) (holding that because the claimant's "social limitations were only moderate, there [was] substantial evidence to support the conclusion that [he] could 'respond appropriately to supervision and coworkers and usual work pressures'").

Substantial evidence exists to support the ALJ's RFC findings on Plaintiff's mental limitations, as the ALJ considered the medical evidence in the record, including treatment records, as well as the opinions of Dr. Ali and the SAPCs.  As the trier of fact, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available and the record as a whole.  *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (citing *Newton*, 209 F.3d at 458).  Accordingly, a reviewing court must defer to the ALJ's decisions.  *See Leggett*, 67 F.3d at 564.  To the extent that Plaintiff complains of the failure to include more restrictive mental limitations in the RFC, the ALJ did not err, and remand is not required on this issue.

### 2.    *Physical Impairments*

Plaintiff also argues that the ALJ's RFC failed to properly accommodate for her physical impairments, including her hand limitations and lumbar spine problems. (doc. 17 at 11-12.)

Here, the ALJ determined that Plaintiff retained the physical RFC to perform light work as defined in 20 C.F.R. §§ 404.1567 and 416.967,[4] except she could lift and/or carry 20 pounds

---

[4]Although this was cited as 20 C.F.R. §§ 404.1567(a) and 416.967(a), which is the definition for "sedentary work," the RFC is consistent with the definition for "light work" under §§ 404.1567(b) and 416.967(b):

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of

34

occasionally and 10 pounds frequently; stand and/or walk and sit for six hours in an eight-hour workday; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; occasionally operate foot controls; and frequently handle and finger, with no exposure to extreme heat, unprotected heights, and unguarded moving machinery. (*See* doc. 12-1 at 39.)  She explained that she assessed the RFC based on the entire record and had "considered all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence," including opinion evidence.  (*Id.*)

a.    *Hand Limitations*

Plaintiff argues that the medical evidence is inconsistent with "the RFC of 'frequent' handling and finger[ing] and lifting 10 pounds frequently with both hands." (doc. 17 at 11.)

In determining Plaintiff's manipulative limitations, the ALJ considered an EMG nerve conduction study that showed "mild to moderate" mononeuropathy in the left wrist, and "mild changes" in the right wrist. (doc. 12-1 at 40.)  Even though the evidence referenced a congenital abnormality and muscle atrophy in the right hand, "there was no evidence that this limitation required treatment."  (*Id.* ) The treatment records showed that Plaintiff received steroid injunctions for pain and inflammation management, and the ALJ noted her reports that her symptoms were "intermittent, but present eight-percent of the time."  (*Id.* at 40-41.)  While Plaintiff alleged that she had limited use of the left hand due to carpal tunnel and subsequent surgery, the ALJ noted that

the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

physical examinations after this surgery "did not note limitations in gripping or using fingers." (*Id.*) The ALJ determined that the medical record did not support wholly disabling limitations due to her carpal tunnel. (*Id.*)

Plaintiff contends that the ALJ erred in finding that the record did not support limited use of both hands because the treatment records show that she had been prescribed new bilateral wrist splints when her old splints failed to alleviate her symptoms.  (doc. 17 at 11.)  The fact that Plaintiff received braces for both wrists, without more, does not demonstrate disabling limitations of both hands.  Additionally, use of braces for both wrists is not mentioned in the medical records, and none of the records state the purpose of the braces or their impact on Plaintiff's hands.

Plaintiff also contends that the ALJ incorrectly stated that her symptoms were "present eight-percent of the time" when they were actually present "80% of the time." (doc. 17 at 11.)  The Commissioner does not dispute this error, but maintains that the RFC is still supported by substantial evidence because the ALJ properly accounted for limitations in Plaintiff's ability to use her wrists. (doc. 21 at 5.)  The incorrect statement of the amount of time that Plaintiff experienced symptoms with her wrist in the ALJ's decision is a factual error.  *See Little v. Berryhill*, No. 3:17-CV-00328, 2018 WL 3406876, at *8 (S.D. Tex. June 25, 2018), *adopted by* 2018 WL 3388877 (S.D. Tex. July 12, 2018) (finding reversible error when the ALJ's decision to assign little weight to the opinion of a claimant's longstanding treating physician was based in large part on the ALJ's incorrect statements of the record).  Nevertheless, the Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required," and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363-64 (5th Cir. 1988).  "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence

in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811 (E.D. Tex. Nov. 28, 2006) (citing *Frank*, 326 F.3d at 622).

Here, the ALJ referenced the medical records prior to Plaintiff's CTR surgery but misstated the frequency of her reported symptoms as eight percent instead of eighty percent. (*See* doc. 12-1 at 40-41.) She then stated that hand limitations were not observed in post-surgery examination, and ultimately determined that the record did not support wholly disabling limitations of her hands. (*Id.* at 41.) When considering the improvement of Plaintiff's left wrist mobility that was observed a month after the CTR surgery, substantial evidence supports the manipulative limitations in Plaintiff's RFC. Because it is inconceivable that the ALJ would have assessed a different physical RFC despite the incorrect statement of the record, the factual error was harmless. *See Frank*, 326 F.3d at 622.

Plaintiff argues that the ALJ ignored medical evidence when she stated that there were no limitations in gripping or using fingers after her CTR surgery on August 16, 2016. (doc. 17 at 11.) She references the treatment notes from her post-surgery visit on August 29, 2016, noting that her left wrist was stiff and that she was afraid to move it. (*Id.*) Although she had issues with her wrist thirteen days after surgery, a later examination of her left wrist on October 10, 2016, showed "excellent motion" with no reports of numbness and tingling in the hands and Thenar function intact. (*See* doc. 12-1 at 1234.) Further, handling and fingering frequently is consistent with Plaintiff's reported activities of daily living, including driving, preparing simple meals, and performing chores, as well as with Dr. Fuentes's November 2017 opinion that Plaintiff had the ability to continuously

finger and feel and to frequently reach and handle. (*Id.* at 40, 1126.)

Because the ALJ relied on medical evidence in the record in making her RFC determination, her assessment regarding Plaintiff's manipulative limitations is supported by substantial evidence. *See Greenspan*, 38 F.3d at 236 (noting that a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment when applying the substantial evidence standard); *see also Winston v. Berryhill*, 3:16-CV-419-BH, 2017 WL 1196861, at *10–11 (N.D. Tex. Mar. 31, 2017).

      *b.*     *Lumbar Spine*

Plaintiff argues that the ALJ "largely minimizes the length[y] record reflecting treatment and symptoms alleged" regarding her lumbar spine impairment.  (doc. 17 at 12.) She references her medical treatment at the VAMC, including branch blocks and steroid injections, the signs of decreased functional ability from her PPEs, her rhizotomies, the positive SLRs, Milgram's tests, and Kemp's tests, imaging studies of the lumbar region, and the medical opinions of Drs. Fuentes and Sazy.[5] (*Id.* at 12-13.)  The Commissioner responds that the ALJ reviewed and addressed these records in her decision, and that they support the physical RFC assessment. (doc. 21 at 5.)

As noted, a reviewing court must defer to the ALJ's decision when substantial evidence supports it. *Leggett*, 67 F.3d at 564.  In *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000), the Fifth Circuit held that an "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Id.* (citing *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984)).  Likewise, the substantial evidence test does not involve a simple search of the record

---

[5]Although Plaintiff cites the MRI study and medical opinion of Dr. Sazy that were conducted after the ALJ rendered her decision and were submitted directly to the Appeals Council, this evidence is properly considered in deciding Plaintiff's request for judicial review because they are part of the administrative record. *See Higginbotham v. Barnhart*, 405 F.3d 332, 337-38 (5th Cir. 2005) (holding that the court "should have considered and addressed the new evidence . . . submitted to the Appeals Council" because it "constitute[d] part of the record").

for isolated bits of evidence that support the ALJ's decision. *Singletary v. Bowen*, 798 F.2d 818, 822-23 (5th Cir. 1986). An ALJ must address and make specific findings regarding the supporting and conflicting evidence, the weight to give that evidence, and reasons for his or her conclusions regarding the evidence. *Armstrong v. Sullivan*, 814 F. Supp. 1364, 1373 (W.D. Tex. 1993). There is no general duty to explain or provide rational and logical reasons for a decision, however. *Escalante v. Colvin*, No. 3:14-CV-0641-G, 2015 WL 1443000, at *14 (N.D. Tex. Mar. 31, 2015) (citing cases); *see Norris v. Berryhill*, No. 3:15-CV-3634-BH, 2017 WL 1078524, at *21 (N.D. Tex. Mar. 22, 2017) (citing *id.*). The regulations require only that an ALJ consider and evaluate medical opinions. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). They do not require an ALJ to state the weight given to each symptom and diagnosis in the administrative record. *See Proge v. Comm'r of Soc. Sec.*, No. 3:13-CV-310-SAA, 2014 WL 4639462, at *4 (N.D. Miss. Sept. 16, 2014) (applying 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).

Here, the ALJ referenced and directly considered the treatment records, imaging studies, the hearing testimony, the opinions of Dr. Fuentes and the SAMCs, and other non-medical evidence when determining Plaintiff's RFC. (*See* doc. 12-1 at 40-43.) The treatment notes of the lumbar spine included physical examinations that showed numerous localized trigger points and tender spots, positive SLR, and radiating paresthesias into bilateral feet and ankles, confirmed by a nerve condition study. (*Id.* at 41.) A January 2015 MRI showed disc degeneration but was otherwise benign, and a January 2017 MRI noted only some degenerative changes with some foraminal narrowing but no central stenosis. (*Id.*) Although Plaintiff alleged that a left-sided rhizotomy in July 2016 was unhelpful, physical examination showed no significant tenderness to palpation, and she did not require an assistive device. (*Id.*) The ALJ determined that the record did not support

wholly disabling limitations due to lumbar spine, and that there was "no evidence of functional limitations that preclude[d] [Plaintiff] from even sedentary exertional work." (*Id.*)

As discussed, the ALJ considered and assigned "some weight" to Dr. Fuentes's opinion that Plaintiff could perform sedentary to light work, and that she was able to sit five hours, stand two hours, and walk two hours in a workday because it was supported by the clinical findings and Plaintiff's reported daily activities and was consistent with the SAMCs' opinions, but did not assign weight to his statement that Plaintiff was unable to work as it spoke to an issue of disability, and she found the opinion that she could not perform most postural maneuvers was not supported by the mild clinical findings and physical examinations. (doc. 12-1 at 42-43.) The ALJ assigned "some weight" to the SAMCs' opinions that Plaintiff was capable of light exertional work, finding them supported by the clinical findings, but found that the evidence, particularly Plaintiff's impending back surgery and paresthesias, reasonably supported "slightly greater limitations." (*Id.* at 42.)

The ALJ considered Plaintiff's testimony that she lived independently at home with her children and that she could prepare some light meals, perform some light chores, and drive when needed. (*Id.* at 40.) She also referenced Plaintiff's VA service ratings, but determined that they were not entitled to weight as medical opinions because they did not describe Plaintiff's work limitations in vocational terms, were based on ratings and findings of disability made by other organizations, and spoke to an issue reserved for the Commissioner. (*Id.* at 42.) The ALJ also considered the opinions associated with Plaintiff's workers compensation claim, as they "provide[d] a snapshot of [Plaintiff's] functioning based on physical examinations," but attributed "some weight" to them given that the standard used to assess limitations were "not consistent with the

Social Security Administration's disability program." (*Id.* at 43.)[6]  Finally, the ALJ noted that Plaintiff's treating PA provided an opinion as to her functional limitations, but attributed it little weight because it was a form document for applying for FMLA, and because the PA was not an acceptable source. (*Id.*)

Plaintiff argues that the medical record contradicts the ALJ's finding that no evidence supports a finding that she is precluded from even sedentary work. (doc. 17 at 13.)  As discussed, the ALJ considered the medical evidence in the record when determining Plaintiff's physical RFC. She did not err when assessing Plaintiff's ability to perform work because she was entitled to weigh the evidence against other objective findings, including the opinion evidence available and the record as a whole. *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (quoting *Newton*, 209 F.3d at 458).

Plaintiff argues that "to the extent that the ALJ presumes medical improvement subsequent to [impending back] surgery," she "has simply played doctor as she made a speculation without medical opinion and record support." (*Id.* at 13.)[7]  While the ALJ did reference Plaintiff's impending back surgery, she did not presume improvement but instead considered it evidence that "reasonably support[ed] slightly greater limitations" than provided in the SAMCs' RFCs. (doc. 12-1 at 42.)  In

---

[6]Plaintiff claims that the ALJ did not properly consider this evidence when the opinions relied on the DOT and the same physical demand level used by the ALJs and VEs. (doc. 17 at 19.) "[T]he determinations of other agencies, while persuasive, do not bind the Social Security Administration." *Loza*, 219 F.3d at 393 (citing 20 C.F.R. § 404.1504). Nevertheless, the ALJ explicitly stated that she considered the opinions of other agencies in accordance with 20 C.F.R. §§ 404.1504, 416.904 and SSR 96-6p, and that she attributed "some weight" to the PPEs. (doc. 12-1 at 43.) Remand is not required on this issue. *See Johnson v. Sullivan*, 894 F.2d 683, 686 (5th Cir. 1990) ("To the extent he was so required, we find the Secretary properly considered the state workmen's compensation settlement in deciding that Johnson was not disabled.").

[7]The phrase "playing doctor" was used in *Frank v. Barnhart*, 326 F.3d 618, 621-22 (5th Cir. 2003), which held that the ALJ erred when he drew his own medical conclusions that were contrary to the claimant's subjective statements and the weight of "vast" medical evidence.

other words, the ALJ made a reasonable inference that Plaintiff will have more limitations, at least initially, after a back surgery. *See* SSR 86–8, 1986 WL 68636, at *8 (S.S.A. 1986) ("Reasonable inferences may be drawn, but presumptions, speculations and suppositions should not be substituted for evidence."), *superseded in part by* SSR 91–7c, 1991 WL 231791, at *1 (S .S.A. Aug. 1, 1991). The decision does not show that the ALJ "played doctor" by referencing an impending back surgery; it instead shows that she fulfilled her role as the finder of fact to weigh the evidence in the record, resolve all conflicts in the evidence, and make an administrative assessment of Plaintiff's ability to work. *See Coats v. Colvin*, No. 3:12-CV-4968-M, 2013 WL 6052879, at *5 (N.D. Tex. Nov. 14, 2013) (noting that an ALJ "is not playing doctor by determining which of contradictory medical opinions to credit [because] that is precisely the type of conflict he is called upon to resolve") (citing *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005)).

Substantial evidence, particularly the medical records from the VAMC, support the ALJ's findings on Plaintiff's physical limitations in the RFC, and the ALJ did not err by rejecting her reported limitations. *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985) (holding that the ability to drive, attend church, do light yard work, grocery shop, and care for personal needs helped support light RFC). Because the ALJ relied on medical evidence in the record in making her RFC determination, her assessment was supported by substantial evidence. *See Greenspan*, 38 F.3d at 236. Remand is not required on this issue.[8]

---

[8]As discussed, the medical record includes an MRI study and medical opinion that post-date the ALJ's decision. (*See* doc. 12-1 at 22-30.) The new evidence did not dilute the record to the extent that the ALJ's decision became insufficiently supported, and was at most evidence of subsequent deterioration of a previously non-disabling condition. *See Higginbotham v. Barnhart*, 163 F. App'x 279, 281-82 (5th Cir. 2006); *see also Hamilton-Provost v. Colvin*, 605 F. App'x 233, 239 (5th Cir. 2015) (quoting *Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir. 1985) ("Remand is not appropriate 'solely for the consideration of evidence of a subsequent deterioration of what was correctly held to be a non-disabling condition.'")).

C.    **Subjective Complaints**

Plaintiff argues that the ALJ's subjective symptom analysis was flawed. (doc. 17 at 20-22.)

Under the Social Security Regulations, the ALJ is required to follow a two-step process for evaluating a claimant's subjective complaints. *See* 20 C.F.R. §§ 404.1429, 416.929; SSR 16-3P, 2017 WL 5180304, at *2-3 (S.S.A. Oct. 25, 2017).[9]  First, the ALJ must consider whether the claimant had a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *See* SSR 16-3P, 2017 WL 5180304, at *3-4.  Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities. *See id.* at *4-5.  The ALJ is to consider the entire record, including medical signs and laboratory findings, and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effect.  *See id.* at *5-7.  The ALJ must also consider a non-exclusive list of seven relevant factors in evaluating the intensity, persistence, and limiting effect's of a claimant's symptoms:

1. the claimant's daily activities;

2. the location, duration, frequency, and intensity of pain or other symptoms;

3. factors that precipitate and aggravate symptoms;

4. the type, dosage, effectiveness, and side effects of any medication taken to

---

[9]Effective March 2017, the Social Security Administration issued Social Security Ruling 16-3p, which eliminated the "use of the term 'credibility' from [its] sub-regulatory policy," clarifying "that subjective symptom evaluation is not an examination of an individual's character." *See* SSR 16-3p, 2017 WL 5180304.  It instructs ALJs to determine "the extent to which ... symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the [claimant's] record" and simply shifts the focus from a more general analysis of a claimant's truthfulness to an objective comparison of a claimant's statements to the evidence of record. *See Howard v. Berryhill*, No. 3:16-CV-318-BN, 2017 WL 551666, at *6 (N.D. Tex. Feb. 10, 2017).  While SSR 16-3p explicitly supersedes SSR 96-7P, "it is evident that the change brought about by SSR 16-3p was mostly semantic." *Id.* at *7 (collecting cases).

alleviate pain or other symptoms;

5. treatment, other than medication, for relief of pain or other symptoms;

6. measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back);

7. and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *7-8; *see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Although the ALJ must give specific reasons for making this determination, "neither the regulation nor interpretive case law requires that an ALJ name, enumerate, and discuss each factor in outline or other rigid, mechanical form. It suffices when the administrative decision is sufficiently specific to make clear that the regulatory factors were considered." *Prince v. Barnhart*, 418 F. Supp. 2d 863, 871 (E.D. Tex. 2005). Moreover, the Fifth Circuit has explicitly rejected the requirement that an ALJ "follow formalistic rules" when assessing a claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). The ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991). The ALJ is in the best position to assess a claimant's credibility because she "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco*, 27 F.3d at 164 n.18.

Here, the ALJ noted the proper standard and two-step analysis for evaluating subjective complaints and symptoms based on a consideration of the entire case record. (*See* doc. 12-1 at 39-40.) She then identified Plaintiff's testimony from the hearing, including her general complaints about her hands, back, and problems with handling stress and changes in routine, as well as the specific testimony that she had limited use of both hands, that she experienced chronic fatigue during the day, and that she could not sit for six hours out of an eight-hour day because she required

frequent breaks and had to shift to standing. (*Id.* at 40.)  She also referenced her testimony about her impending back surgery, and that she drove to the hearing and would drive her children to and from school each day. (*Id.*)  She reviewed her medical records, the diagnoses of her doctors and their related treatment, and the diagnostic tests and imaging studies, and noted that she did not require assistive device for her lumbar impairment and that she did not show limitations in gripping or fingering post-CTR surgery.  (*Id.* at 40-43.) She also noted Plaintiff's conservative treatment for depression and anxiety, that she did not require inpatient or intensive care, and that the clinical findings were not consistent with the extreme symptom reporting. (*Id.* at 42.)  The ALJ determined that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (*Id.* at 40.)

Plaintiff argues that the ALJ's "subjective symptoms analysis focuse[d] almost exclusively on the singular factor of daily activities." (doc. 17 at 21.)  As discussed, however, the ALJ's analysis for evaluating subjective complaints and symptoms relied on the same evidence considered when determining Plaintiff's RFC. (*See* doc. 12-1 at 39-43.)  She fully analyzed the treatment records, the medical opinions of her treating physicians and the SAMCs and SAPCs, Plaintiff's hearing testimony, and other non-medical evidence. (*Id.*)  Although not in a formalistic fashion, the ALJ considered the factors for evaluating subjective complaints and symptoms and adequately explained her reasons for rejecting Plaintiff's subjective complaints, and there is substantial evidence to support her determination. *See Falco*, 27 F.3d at 164.  Plaintiff has not shown that the ALJ erred in her analysis, particularly because her decision shows that she properly considered the record as a

whole, and it is sufficiently specific to show that the regulatory factors were considered. *See Prince*, 418 F. Supp. 2d at 871; *see also Lopez v. Astrue*, 854 F. Supp. 2d 415, 424-25 (N.D. Tex. 2012) (finding that the ALJ properly evaluated the plaintiff's credibility by expressly acknowledging that he "experienced some level of pain and functional loss, but concluded that [the] plaintiff's subjective complaints of pain were out of proportion to the objective medical evidence"). Moreover, the ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference. *See Carrier*, 944 F.2d at 247. Because there is substantial evidence to support the ALJ's analysis of Plaintiff's subjective symptoms, remand is not required on this issue. *See Falco*, 27 F.3d at 164; *Giles v. Astrue*, 433 F. App'x 241, 249 (5th Cir. 2011) (finding ALJ's analysis of plaintiff's subjective complaints supported by his discussion of medical records and opinions).

## IV. RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED**, on this 24th day of August, 2020.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

47